```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF FLORIDA
 2                       MIAMI DIVISION
        CASE NOs. 1:98-cr-00023-JAL-2, 1:00-cr-00220-JAL-1
 3

 4


 5   UNITED STATES OF AMERICA,

 6            Plaintiff,                  October 7, 2022
                                         11:13 a.m.
 7        vs.

 8   JOAQUIN RIVERO,

 9            Defendant.                  Pages 1 THROUGH 65

10   _____

11                    TRANSCRIPT OF SENTENCING
12            BEFORE THE HONORABLE JOAN A. LENARD
              UNITED STATES SENIOR DISTRICT JUDGE
13

14   Appearances:

15   FOR THE GOVERNMENT: UNITED STATES ATTORNEY'S OFFICE
                          KATHERINE GUTHRIE, AUSA
16                        99 Northeast 4th Street
                          Miami, Florida 33132
17

18   FOR THE DEFENDANT:  MICHAEL BLACKER PA
                          MICHAEL H. BLACKER, ESQ.
19                        PO Box 162850
                          Miami, Florida 33116
20

21   COURT REPORTER:     Yvette Hernandez
                          U.S. District Court
22                        400 North Miami Avenue, Room 10-2
                          Miami, Florida 33128
23                        yvette_hernandez@flsd.uscourts.gov

24

25
```

```
 1                        I N D E X

 2     Certificate...................................        65

 3

 4

 5                     W I T N E S S

 6     ON BEHALF OF THE DEFENDANT:                        PAGE

 7     JOAQUIN RIVERO
       DIRECT EXAMINATION BY MR. BLACKER                    11
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Yvette Hernandez, Official Court Reporter
400 North Miami Avenue, 10-2
Miami, Florida 33128
(305) 523-5698

```
 1          (Call to order of the Court, 11:13 a.m.)

 2          COURTROOM DEPUTY:  Calling Case Number 98, Criminal,

 3     23, and Criminal 00-220, United States of America v. Joaquin

 4     Rivero.

 5          Counsel, please state your name for the record,

 6     starting with the Government.

 7          MS. GUTHRIE:  Katherine Guthrie on behalf of the

 8     United States.  Good morning, Your Honor.

 9          THE COURT:  Good morning.

10          MR. BLACKER:  Good morning, Your Honor.  Michael

11     Blacker on behalf of Mr. Rivero, who is present before the

12     Court.

13          THE COURT:  Good morning.

14          And the Defendant is using the aid of a Spanish

15     language interpreter.

16          You may be seated.

17          Probation, would you state your appearance as well.

18          PROBATION OFFICER:  Yes.  Good morning, Your Honor.

19     Vanessa Pulido on behalf of Probation.

20          THE COURT:  Good morning.

21          Okay.  Mr. Rivero is set for sentencing on two cases

22     today.

23          Mr. Rivero, have you read the Second Revised Advisory

24     Presentence Investigation Report, or was it read to you?

25          THE DEFENDANT:  (Through Interpreter.)  I read it.
```

```
 1              THE COURT:  And have you and your attorney discussed

 2    the Second Revised Advisory Presentence Investigation Report?

 3              THE DEFENDANT:  We talked.

 4              THE COURT:  All right.  The Defendant filed objections

 5    to the report, and in addition an amended motion for variance.

 6    So we'll proceed with the objections first.

 7              Mr. Blacker?

 8              MR. BLACKER:  Yes, ma'am.

 9              I'm so sorry.  I'm trying to get my --

10              THE COURT:  Oh.  Take your time.  That's okay.  Take

11    your time.

12              MR. BLACKER:  Thank you.  Yes, ma'am.

13         (Pause in proceedings.)

14              THE COURT:  Let me know when you're ready.  I just

15    want to make sure we're all traveling under the same docket

16    entries.  As soon as you're ready, Mr. Blacker.

17              MR. BLACKER:  Thank you, ma'am.

18              THE COURT:  Uh-huh.

19         (Pause in proceedings.)

20              MR. BLACKER:  May it please the Court.

21              THE COURT:  Okay.  Let me review the docket entries,

22    to make sure that we're all working off the same paperwork.

23    For 98-00023, it's Docket Entries 91, 93, and 95; is that

24    correct?

25              MS. GUTHRIE:  That's what I have, Your Honor, yes.
```

```
1              MR. BLACKER:  Yes, ma'am.

2              THE COURT:  And for 00-00220, it's Docket Entry 45 and

3    47, and 51; is that correct?

4              MR. BLACKER:  Yes.

5              MS. GUTHRIE:  I have, for the Government's Response in

6    Opposition to Defendant -- to the Defendant's Motion for

7    Downward Variance, that it's actually Docket Entry 50 from

8    00-cr-00220 and Docket Entry 96 from 98-cr-00023.

9              THE COURT:  Was there an amended response to the

10   objections by the Government?  Because I have Government's

11   Response to Defendant Objections as Docket Entry 47.  I don't

12   have that number.  That's why I'm asking.  I think it will come

13   out shortly if you're correct.

14             MS. GUTHRIE:  I'm just reviewing the docket that I

15   printed yesterday, Your Honor.

16             THE COURT:  Okay.

17        (Pause in proceedings.)

18             MS. GUTHRIE:  Your Honor, from the docket yesterday, I

19   have, in Case Number 00-cr-220, Docket Entry 47 is the

20   response --

21             THE COURT:  Okay.

22             MS. GUTHRIE:  -- to objections to PSI.

23             THE COURT:  Okay.  51 is the reply.  There isn't

24   really a reply under the rules.  But that's what we have,

25   right?
```

```
 1          MS. GUTHRIE:  Yes.  50 is the Government's response
 2   and 51 is the reply.  Sorry.
 3          THE COURT:  I'm sorry?
 4          MS. GUTHRIE:  50 is the Government's response.
 5          THE COURT:  What was 47?  You just said 47.
 6          MS. GUTHRIE:  I apologize, Your Honor.
 7          THE COURT:  I have 47.  That's what you said before,
 8   but then you said 50.  That's why I want to make sure.
 9          MS. GUTHRIE:  So Docket Entry 47 is response to the
10   objections.
11          THE COURT:  And you filed objections?  Is that --
12          MS. GUTHRIE:  No.  No.  No.  Sorry.  I'll restart,
13   Your Honor.
14          THE COURT:  Okay.
15          MS. GUTHRIE:  Docket Entry Number 47 --
16          THE COURT:  Yes.
17          MS. GUTHRIE:  -- is the Government's Response to the
18   Defendant's Objections to the Presentence Investigation Report.
19          THE COURT:  Yes.
20          MS. GUTHRIE:  And then Docket Entry 50 is the
21   Government's Response in Opposition to the Defendant's Motion
22   for a Downward Variance.
23          THE COURT:  Oh, okay.  I have not gotten to that yet.
24          MS. GUTHRIE:  Oh.  I apologize.
25          THE COURT:  Okay.  I'm just dealing with the
```

1    objections now.

2           Okay.  So for the objections, it's 45, 47, and 51 in

3    00-00220, correct?

4           MS. GUTHRIE:  Yes, Your Honor.

5           THE COURT:  Okay.  We're okay.

6           All right.  So Mr. Blacker, how are you proceeding

7    today?

8           MR. BLACKER:  Yes.  I want to discuss that with the

9    Court.  Thank you.

10          Your Honor, I'm prepared to go forward with live

11   testimony.  I'm also prepared to go forward with the proffer

12   and let the Court and the counsel and Government inquire of the

13   witness who would testify -- anything that they would like to

14   cross him on, if that's case.  Whatever the Court's pleasure.

15          THE COURT:  Well, who is the witness?

16          MR. BLACKER:  The Defendant.

17          THE COURT:  Okay.  Does the Government have a

18   response?

19          MS. GUTHRIE:  The Government doesn't object.  We

20   learned of the Defendant testifying this morning when

21   Mr. Blacker told us.  And if the Defendant would like to speak,

22   we have no problem with that.  But it's at the discretion of

23   Your Honor.

24          THE COURT:  Okay.  So you want to proffer what you say

25   the facts are, Mr. Blacker, and then the Defendant is going to

8

```
1    be available for cross-examination?  Is that --

2              MR. BLACKER:  I think that might be a method by

3    which -- the easiest method to proceed.  But I certainly can

4    put him on for direct.  I've prepared a direct examination and

5    I've typed it all out in questions.  So whatever the Court's

6    pleasure is.

7              THE COURT:  I think I need testimony.

8              MR. BLACKER:  Yes.  Thank you.  Okay.

9              THE COURT:  Okay.  So he is your first and only

10   witness?

11             MR. BLACKER:  Well, depending upon what happens, yes.

12   I might call a member of his family.

13             THE COURT:  Oh.  That's fine.

14             MR. BLACKER:  But I think so.  I think he's going to

15   be the only witness.

16             THE COURT:  He's the first witness.  Let's put it that

17   way.

18             MR. BLACKER:  Yes, ma'am.

19             THE COURT:  Okay.  So --

20             MS. GUTHRIE:  Your Honor, if I may.

21             THE COURT:  Yeah.

22             MS. GUTHRIE:  I apologize.  Also, I would just like to

23   add that the Government's position is that this is precluded by

24   the Factual Proffer that he agreed to and stipulated to during

25   his change of plea in 1998.  But again, we appreciate his
```

```
 1    testimony 24 years later.

 2              THE COURT:  Okay.  And you have a response to that

 3    Mr. --

 4              MR. BLACKER:  I didn't hear that.  I'm so sorry.

 5              MS. GUTHRIE:  I said the Government believes that his

 6    testimony is precluded by -- any additional facts that he's

 7    proffering, that he's testifying to, are precluded by the

 8    Factual Proffer of his Plea Agreement, anything that

 9    contravenes the facts in the proffer.

10              MR. BLACKER:  Well, Your Honor, there is a presumption

11    that the testimony is correct and true; however, we're going to

12    rebut that presumption.

13              THE COURT:  You're talking about the presumption at

14    the Rule 11 hearing.

15              MR. BLACKER:  Yes, ma'am.

16              THE COURT:  Okay.  All right.  So you're going to -- I

17    agree with you that that is the law, that there is a

18    presumption of accurate, factual presentation at the Rule 11

19    hearing.  And the Government can certainly cross on that and

20    make their argument, and you can respond to that.

21              So how do you want to present the witness?  Do you

22    want him to come here or you want to have him testify from

23    there?  He can take off of his mask if he wants to testify.

24              MR. BLACKER:  Can I ask him if he's more

25    comfortable -- through the interpreter -- is he more
```

```
1    comfortable here or does he want --

2              THE COURT:  I can see him from here.

3              MR. BLACKER:  Is it okay?

4              THE COURT:  So I'm the fact finder.

5              MR. BLACKER:  Okay.

6              THE COURT:  But we need to place him under oath.

7              MR. BLACKER:  Yes, ma'am.

8              COURTROOM DEPUTY:  Sir, please raise your right hand.

9              THE COURT:  He needs to put the earphones in, please.

10             Is he wearing a neck brace?

11             MR. BLACKER:  Yes, he is.

12             THE COURT:  Is it okay for him to have the earphones

13    in?

14             MR. BLACKER:  He's doing quite well.  Yes.

15             THE DEFENDANT:  Yes.

16             THE COURT:  Okay.  Place him under oath, please.

17             COURTROOM DEPUTY:  Sir, please raise your right hand.

18        JOAQUIN RIVERO, DEFENDANT, SWORN

19             THE COURT:  Okay.  You can put your hand down, sir.

20             Go ahead, Mr. Blacker.

21             MR. BLACKER:  Your Honor, one more housekeeping

22    matter.  Would you like me to follow the objections from the

23    original -- from the objections that were in the docket that

24    we're dealing with, or not?  I can start with our objections,

25    but I can also -- I also have -- I'm prepared to start
```

```
 1   elsewhere for background purposes.

 2           THE COURT:  No.  Let's go through Docket Entry 91.

 3           MR. BLACKER:  Okay.

 4           THE COURT:  Correct?

 5           MR. BLACKER:  Yes, ma'am.

 6           THE COURT:  You need to pull your microphone down

 7   please, Mr. Blacker.

 8           MR. BLACKER:  I'm sorry.

 9           THE COURT:  Thank you.

10                     DIRECT EXAMINATION

11   BY MR. BLACKER:

12   Q.  Would you state your name for the record, please.

13   A.  Joaquin Rivero.

14   Q.  And you are the Defendant in this case; is that correct?

15   A.  Yes, Your Honor.

16   Q.  Okay.  Mr. Rivero, let's start with the day of your arrest.

17   Okay?  On the date of your arrest, did you consent to the law

18   enforcement officers' search of your residence?

19   A.  Yes, Your Honor.

20   Q.  At the time of that search, was your residence -- did you

21   own the residence?

22   A.  Yes.

23   Q.  Tell us about the buildings that were on the property, if

24   it was more than one.

25   A.  There was my residence, there was an efficiency, and there
```

```
 1   was a shed.
 2              MR. BLACKER:  Okay.  Your Honor, may I take my mask
 3   off or no?
 4              THE COURT:  Yeah.  You can take your mask off.
 5              MR. BLACKER:  Thank you.  I have a breathing problem.
 6   BY MR. BLACKER:
 7   Q.  Okay.  And was anyone living in your residence at the time?
 8   A.  In my residence, my wife, my two children, and I.
 9   Q.  And was anyone living in the efficiency on the date of your
10   arrest?
11   A.  I had rented the efficiency to Alfredo Sosa.
12              THE COURT:  Let me interrupt you for one minute.
13              Clem, can you make sure the air purifiers are on
14   medium, please, in the back as well as in the front.
15              Thank you.
16              Go ahead, Mr. Blacker.
17              MR. BLACKER:  Thank you.
18   BY MR. BLACKER:
19   Q.  When the officers encountered you, did you immediately
20   consent to their search of your residence?
21   A.  Yes, Your Honor.
22   Q.  As well as the other property on that location?
23   A.  Yes.
24   Q.  And did the officers, among other things, seize US currency
25   from your residence?
```

```
 1              THE COURT:  Can you not lead the witness, please.
 2              MR. BLACKER:  Okay.
 3   BY MR. BLACKER:
 4   Q.  Do you remember what the officers, in terms of currency or
 5   negotiable instruments, seized from your residence?
 6   A.  Well, the money that I had from my business.  It was a
 7   jewelry and clothing business.
 8   Q.  Okay.  Do you remember how much money was seized?
 9   A.  It was like 30-some-thousand.  I don't remember exactly.
10   Q.  Okay.  And do you remember whether or not the money was all
11   in one lump sum or there were different packages of money in
12   the house?
13   A.  Well, the money was practically all together, plus the
14   money that I would use on a daily basis.
15   Q.  Okay.  And the -- the Presentence Investigation Report,
16   which we will call the PSI, reflected that $30,000 was found in
17   the master bedroom.  Do you remember that?
18   A.  I cannot remember exactly how much money I had in one place
19   or in another place.  I can tell you that I had approximately
20   $30,000.
21   Q.  Do you remember the source of that money, how you obtained
22   that money?
23   A.  So that money, aside from being -- that money -- aside from
24   being part of my income, some of that money, I had put aside
25   for my daughter when she would come back, so I could buy her a
```

1   car.

2   Q.   Where was your daughter?

3   A.   In the Marines.

4   Q.   Was any of the money, the cash monies that were seized at

5   your residence, derived from criminal activity?

6   A.   Never.

7   Q.   The PSI also reflects that there were two small scales

8   found in your residence.  Were those scales yours?

9   A.   Those scales were mine because they were used to weigh

10  gold.

11  Q.   Were they gram scales or kilos, or did they go up to kilos?

12  A.   That was pennyweight.

13  Q.   They were pennyweight scales?

14          MR. BLACKER:  Is that what he said?

15          Thank you.

16  BY MR. BLACKER:

17  Q.   Prior to your arrest, were you engaged in lawful

18  businesses?

19  A.   Legal, all the time.

20  Q.   What were the businesses that you were engaged in?

21  A.   I had a sale of jewelry, and also I would sell clothing and

22  shoes as well.  And all that was bought from different

23  jewelries or different clothing stores.

24  Q.   Okay.  And when you sold the jewelry, did you sell it

25  for -- how were you paid, in what form?

1   A.  Well, some will pay cash, depending on the price.  And some

2   others would pay me in installments, and that was weekly.

3   Q.  And the installments, were those in cash or some other form

4   of payment?

5   A.  Everything in cash.

6   Q.  Okay.  And when you purchased the jewelry and the clothing,

7   how did you pay for it?

8   A.  In cash as well.

9   Q.  And did you keep the cash -- where did you keep the cash

10  that you were paid from your businesses?

11  A.  Well, part of it, I had -- I would put in a piece of

12  furniture that I had in the bedroom.  And then the rest -- the

13  other I would put in the other bedroom on top of a box.

14  Q.  And did you have a sum of -- in your daily pocket money --

15  did you have a sum of cash in your daily pocket money?

16  A.  That I would use on a daily basis.

17  Q.  There was also a check in the amount of $8,975, made out to

18  Barbaro C. Hernandez, that was seized at your residence.  Who

19  is Barbaro C. Hernandez?

20  A.  So Barbaro C. Hernandez was the husband of a niece of my

21  first wife.  And he came with that check and told me to put it

22  away because he was going to buy -- he came from New York, and

23  he told me to put it away because he was going to buy a truck

24  with it.

25  Q.  Was that check returned to you?

```
 1    A.  Yes.  It was returned to me, and I gave it to him.

 2    Q.  Were you intending to use any of the cash in your home to

 3    commit any crime?

 4    A.  Never.

 5    Q.  Were you intending to use the cash or currency to

 6    facilitate the commission of a crime?

 7    A.  No.  No.  Never.

 8    Q.  Did you agree to forfeit the money?

 9    A.  So the officers were outside when they came in to check the

10    house.  And they left me outside, and then they went into the

11    house to do their -- the search.  And then is when they told me

12    that they had found ...

13    Q.  Okay.  We'll get back to that area.

14        After the search of your residence, were you transported to

15    jail?

16    A.  Yes.  After all the search that they did, they did take me

17    to the jail.

18    Q.  Okay.  Were there any -- other than residue marijuana, were

19    there any other drugs in your residence?

20    A.  No.  Never.

21    Q.  Was there any drug paraphernalia in your residence?

22    A.  No.

23    Q.  Mr. Rivero, we're going -- for purposes of today's hearing,

24    we're going to delineate, as you said, the three buildings; the

25    residence, the shed, and the efficiency.
```

1   A.  Okay.

2   Q.  Yeah.  Okay?

3   A.  Yes.

4   Q.  When we talk about the residence, we're talking about where

5   you and your wife and your children lived.  Do you understand

6   that?

7   A.  As a matter of fact, yes.

8   Q.  Okay.  When we talk about the efficiency, we're going to

9   talk about the efficiency that you rented out.

10   A.  That is right.

11   Q.  And when we talk about the shed, we're going to talk about

12   your utility or shed that you had on the property as well; is

13   that correct?  Is that all right?  I'm sorry.

14   A.  Yes.

15   Q.  Okay.  All right.  So we're talking about your residence

16   now.  Other than the residue amount of marijuana, was there

17   anything to do with drugs, drugs preparation, drugs

18   manufacture, or anything to do with drugs in your residence?

19   A.  No.  Nothing.

20   Q.  Were there any -- there were -- withdrawn.

21      Let's talk about -- how long had you been living at that

22   property?

23   A.  In that house, we had been -- we had been living since the

24   year '82, all the way to '98.

25   Q.  Thank you.

1      And was the efficiency occupied at the time of your arrest?

2  A.  I had it rented to Alfredo Sosa.

3  Q.  And under what circumstances did he rent the efficiency?

4  A.  He rented the efficiency from me to use it like kind of a

5  deposit warehouse type of thing.

6  Q.  What did he tell you he was going to use the efficiency for

7  when you first rented it?

8  A.  He told me that he had a friend who worked at a certain

9  place, that he would gather all the merchandise that would

10  expire that would be paid by the insurance.

11  Q.  And he was going to put that merchandise in the efficiency?

12  A.  Well, see, as a matter of fact, he brought merchandise.

13  That very first day, he brought like seven air-conditionings,

14  he brought some toolboxes, plus some plastic chairs.

15  Q.  And at the time of your arrest, how long had Mr. Sosa been

16  renting the efficiency, approximately?

17  A.  Like around a year more or less.

18  Q.  Did the law enforcement officers, on the day of your

19  arrest, also search the efficiency and the shed?

20  A.  Yes.

21  Q.  The PSI reflects that numerous illegal items, drugs, items

22  for preparation of cocaine, were found in the shed.  Is that

23  correct?

24  A.  No.

25  Q.  Was anything illegal whatsoever kept in the shed?

1    A.  No.

2    Q.  What was kept in the shed?

3    A.  So there, we had the washer, the dryer.  There was also a

4    freezer there.  And we would also keep Christmas things there.

5    And there was also a bicycle as well.

6    Q.  Did your wife have access to the shed?

7    A.  The shed was completely open.

8    Q.  Did your children have access to the shed?

9    A.  To the shed, yes.

10   Q.  Okay.  Did there come a time that you came to realize that

11   Mr. Sosa was conducting the preparation of cocaine for sales in

12   the efficiency?

13   A.  That was like six months after, more or less.

14   Q.  Under what circumstances did you find out that he was, for

15   lack of a better word, preparing cocaine for sale in your

16   efficiency?  How did that happen?

17   A.  So that was the day that I went to collect from him the

18   rent, because it had been like two, three months.  He would

19   always be delayed somewhat on payment.  So that day I went to

20   collect from him.  And I knocked at the door, but he just open

21   it a little bit ajar and I noticed that there was something not

22   correct going on.

23   Q.  And when you saw something was quote, not correct, unquote,

24   what happened then?  What did you say to him?

25   A.  I told him:  "What are you doing?"  I said:  "What is it

```
 1   that you're doing here?"  And he said:  "No.  I'm just

 2   preparing some things here, but it's the first time I've done

 3   this," he said.

 4          MR. BLACKER:  I'm sorry.  I didn't hear the last

 5   sentence.  It's the first time what?

 6          THE INTERPRETER:  "I've done this, he said."

 7   BY MR. BLACKER:

 8   Q.  So did he indicate that he was doing something illegal in

 9   the efficiency?

10   A.  He told me that it was the first time that he had been

11   doing that there.  And I said that that can't go on because I

12   had two kids there who had already gotten pretty old, and I

13   said:  "This cannot go on here."  And he said:  "Well, in

14   addition to the $300 I give you, I'm going to give you more."

15          MS. GUTHRIE:  Objection, Your Honor.  Hearsay.

16          THE COURT:  Sustained.

17   BY MR. BLACKER:

18   Q.  Did you eventually reach an agreement with Mr. Sosa to

19   allow him to stay there?

20          THE COURT:  Don't lead the witness, please.

21          MR. BLACKER:  Okay.

22          THE COURT:  I need to hear it from him.

23   BY MR. BLACKER:

24   Q.  Tell us about whether or not an agreement was entered with

25   Mr. Sosa to allow him to stay there.
```

1    A.   I told him to start looking for a place to move to because

2    I couldn't allow that.   What's more, I told him that I had

3    already agreed to rent that place to a lady, and that I gave it

4    to him because I knew his family from Cuba.

5           MS. GUTHRIE:   Objection.   Hearsay, Your Honor, to that

6    entire prior statement.

7           THE COURT:   Overruled.

8    BY MR. BLACKER:

9    Q.   At the time of your arrest, did you have any knowledge

10   about how cocaine is prepared for sale?

11   A.   Never.

12   Q.   Did you have any -- do you know the types of chemicals that

13   are used to cut cocaine?

14   A.   No.

15   Q.   Did you know -- I'm sorry.   At the time of your arrest, did

16   you know?   Please, I'm sorry.

17   A.   No.   No.   I've never known how that is prepared.

18   Q.   Did you purchase any of the items that were in the

19   efficiency that were used in the preparation of cocaine?

20   A.   No.   All of that belonged to Sosa.

21   Q.   Did you ever mix any of the items?

22           MS. GUTHRIE:   Objection.   Relevance.

23           THE COURT:   Overruled.

24   BY MR. BLACKER:

25   Q.   Did you ever mix any of the items to prepare cocaine?

```
 1    A.  Never.

 2    Q.  Did you ever prepare any cocaine for sale in the

 3    efficiency?

 4    A.  Never.

 5    Q.  Who had access to the efficiency during Sosa's leasehold?

 6           MS. GUTHRIE:  Objection.  Calls for speculation.

 7           THE COURT:  Sustained.  Rephrase your question.

 8           MR. BLACKER:  I'm sorry.  What was the objection?

 9           MS. GUTHRIE:  Calls for speculation.

10           MR. BLACKER:  Okay.

11           THE COURT:  Rephrase your question.

12    BY MR. BLACKER:

13    Q.  Okay.  You were the landlord of the efficiency; is that

14    correct?

15    A.  Uh-huh.

16    Q.  Do you know of anybody who had any keys to the efficiency

17    other than you?

18    A.  Sosa.

19    Q.  Other than Sosa.  Do you know of anybody that had any

20    access to the efficiency other than you and Sosa?

21           MS. GUTHRIE:  Objection.  Leading.

22           THE COURT:  Sustained.  Rephrase your question.

23    BY MR. BLACKER:

24    Q.  Who else besides you and Sosa had a key to the efficiency?

25    A.  I don't think anyone else did, unless Sosa gave the key to
```

1    someone else.  But I never saw anyone else there other than

2    him.

3    Q.  Okay.

4          MS. GUTHRIE:  Your Honor, if I may.  This entire line

5    of questioning regarding the speculation of who had access to

6    the shed, consists of speculation by the --

7          THE COURT:  This is about the efficiency.  And he says

8    he never saw anyone else at the efficiency.  So you can move

9    on, Mr. Blacker.  I think you've covered this.

10         MR. BLACKER:  Yes.  Thank you.

11   BY MR. BLACKER:

12   Q.  The PSI speaks to a five-gallon bucket containing one kilo.

13   Would you tell us about what you know about that bucket and how

14   it was discovered.

15   A.  Well, when the officer discovered this in the efficiency, I

16   was called over.  I had been standing outside, and I was told

17   to come in.  And then the officer who was translating for me

18   said:  "This officer wants to know if this is yours."

19   Q.  And what did you -- what did you think he meant by:  "This

20   is yours"?

21         MS. GUTHRIE:  Objection.  Speculation.

22         THE COURT:  Sustained.

23   BY MR. BLACKER:

24   Q.  What did you say?

25   A.  When he asked -- and he said:  "He wants to know if this

```
1   here is yours," I thought he meant the property, and I said:

2   "Yes.  All of this here is mine."

3   Q.  Had you ever seen the kilo that was in the bucket prior to

4   that day?

5   A.  No.

6   Q.  Let me just return for a question on the efficiency.  Other

7   than the time that you knocked on the door and Sosa opened it,

8   had you been in the efficiency prior to your arrest?

9   A.  No.

10  Q.  But you knew what he was doing in there?

11  A.  After the day I discovered him, yes.  Before that, I did

12  not.

13  Q.  Okay.  In your residence, the PSI says that there was a

14  memo book and record seized in your house.  What did that --

15  what was contained in that record book that was seized in your

16  house?  What did it refer to?  What were the notations inside?

17  What were they in reference to?

18  A.  Well, that was a notebook that I kept so that I could keep

19  track of the gold and the clothes that I would buy and that I

20  was selling.

21  Q.  Was there anything to do with the cocaine business or any

22  illegal business in that book?

23  A.  Not at all.  Not at all.

24  Q.  Did you ever have any discussions with Sosa about the

25  cocaine business while you were in your residence?
```

1    A.   No.

2    Q.   About how many times did Sosa pay you rent during the

3    period of the lease?

4    A.   Well, the thing is that he paid -- he wouldn't pay me every

5    month.  He would pay sometimes two months at a time or three

6    months at a time, or something like that.

7    Q.   There was a safety deposit slip and box -- a key to a box

8    found in your residence.  Who did that belong to?

9    A.   Well, I had this box made because I wanted to keep the

10   weapons in it.  Like I said, I had already two kids who were

11   getting pretty old.  And one of their friends had a dad who had

12   a weapon, and he, while playing with the gun, ended up shooting

13   himself.  So as a precaution, I had that box made to keep the

14   weapons.

15   Q.   I'm sorry.  I was not articulate.  I was inarticulate.

16        I'm talking about a safety deposit box, not a safe.  A

17   safety deposit box from a bank that you keep valuables in that

18   was found at your residence.

19             THE COURT:  What's the relevance of this, Mr. Blacker?

20             MR. BLACKER:  They mention that it may have been --

21   they mentioned that it may have been involved, part of the drug

22   conspiracy, and I'm trying to negate that that.

23             THE COURT:  Where is that?

24             MR. BLACKER:  It's in the -- it's in the PSI.  It's in

25   the --

```
 1              THE COURT:  Was there a search warrant on the safety
 2   deposit box?
 3              MR. BLACKER:  No, there wasn't.
 4              THE COURT:  Well, I won't consider it then.
 5              MR. BLACKER:  I'm sorry?
 6              THE COURT:  I won't consider the safety deposit box.
 7              MR. BLACKER:  Okay.
 8              THE COURT:  It's speculative that it may have been
 9   involved, if there wasn't an indication of contraband or
10   evidence of contraband.
11              MR. BLACKER:  There was indicia that it may have been.
12              Thank you.  I'll move on.
13   BY MR. BLACKER:
14   Q.  Do you remember that there was a bundle of cash of 6,000
15   with a wrapper on it that was seized at your house -- at your
16   residence?  Excuse me.
17              MS. GUTHRIE:  Objection.  Leading.
18              THE COURT:  Sustained.  Rephrase your question.
19              MR. BLACKER:  Okay.
20   BY MR. BLACKER:
21   Q.  The PSI reports that there was a bundle of cash, $6,000
22   found at your residence.  Do you remember -- can you tell the
23   Court if you remember what that bundle was for.
24              MS. GUTHRIE:  Objection.  Leading.
25              THE COURT:  Sustained.  Rephrase your question.
```

```
1    BY MR. BLACKER:

2    Q.  You've told us that you had about $30,000 in your house.

3    Do you remember any of the amounts of cash that were in

4    different bundles?

5              MS. GUTHRIE:  Objection.  Leading.

6              THE COURT:  Overruled.

7              THE DEFENDANT:  Well, go figure.  That money that I

8    had been keeping separately was the money for a car that I was

9    going to buy for my daughter.  And there was also $12,000 from

10   a tow truck that I sold to Antonio Gasalla, who worked for

11   Continental Truck in Hialeah.

12   BY MR. BLACKER:

13   Q.  Okay.  Were there any handguns in your residence?

14   A.  Yes.  There were four weapons.

15   Q.  Did you store them in your residence?

16             MS. GUTHRIE:  Objection.  Leading.

17             THE COURT:  Sustained.  Rephrase your question.

18   BY MR. BLACKER:

19   Q.  Tell us about the handguns in your residence.

20             MS. GUTHRIE:  Objection.  Assuming facts not in

21   evidence.

22             THE COURT:  Overruled.

23             THE DEFENDANT:  There were four handguns in my

24   residence.  There were two that were in my name, and I had a

25   license to carry them.
```

1          The other two, one belonged to my father-in-law and

2    the other one belonged to my Uncle Celestino, who had passed

3    away not long ago.  And since I was always the person who take

4    care of him, when he went into the hospital, he gave me

5    everything that he had on him.

6    BY MR. BLACKER:

7    Q.  And where did you keep the guns?

8    A.  They were inside of a box that I had specially made with a

9    key, to -- for protection.  So -- because I wanted to be

10   careful that my kids wouldn't end up with them.

11   Q.  And during the entire time that Sosa was leasing the

12   efficiency, did you ever remove any of the guns from the safe

13   or box?

14   A.  Not at all.  No.

15   Q.  Where was the safe located?

16   A.  It was next to my main bedroom, in a closet.  That's where

17   that safe was.

18   Q.  When you say next to your main bedroom, do you mean it was

19   in the master bedroom or in another room?

20   A.  No.  It was in the next bedroom over.

21          MR. BLACKER:  Sorry, Your Honor.

22       (Pause in proceedings.)

23   BY MR. BLACKER:

24   Q.  Did you ever consider the gun secured or protected the drug

25   business in any way?

1          MS. GUTHRIE:  Objection.  Leading.

2          THE COURT:  Sustained.  Rephrase your question.

3          THE DEFENDANT:  No.

4          THE COURT:  His answer is stricken.  Rephrase your

5  question.

6          MR. BLACKER:  I see.  Thank you.

7  BY MR. BLACKER:

8  Q.  Did you have any plans to use the handguns in connection

9  with the cocaine business?

10          MS. GUTHRIE:  Objection.  Leading.

11          THE COURT:  Sustained.  Rephrase your question.

12          THE DEFENDANT:  No.  No.

13          THE COURT:  His answer is stricken.

14  BY MR. BLACKER:

15  Q.  Were the guns connected with the criminal activity in any

16  way?

17          MS. GUTHRIE:  Objection.  Leading.

18          THE COURT:  Sustained.  Rephrase your question.

19  BY MR. BLACKER:

20  Q.  Tell the Court about whether or not the guns had anything

21  to do with the -- your agreement to allow Sosa to create

22  cocaine in the efficiency.

23          MS. GUTHRIE:  Objection.  Leading.

24          THE COURT:  Overruled.

25          You can answer, sir.

```
 1              THE DEFENDANT:  No.  Not at all.  Not at all.

 2    BY MR. BLACKER:

 3    Q.  Tell the Judge about whether or not the guns had any --

 4    were involved in any way with what Sosa was doing.

 5    A.  Never.

 6         (In English.)  Never.

 7         (Through Interpreter.)  Never.

 8    Q.  Did you ever use any of the handguns in connection with

 9    this cocaine crime?

10              MS. GUTHRIE:  Objection.  Leading.

11              THE COURT:  Sustained.  Rephrase your question.

12    BY MR. BLACKER:

13    Q.  Tell the Court about whether or not you ever used any of

14    the handguns in connection with a crime.

15    A.  Not at all.

16    Q.  Did you ever have a conversation with any -- with Mr. Sosa,

17    which had anything to do with handguns?

18              MS. GUTHRIE:  Objection.  Leading.

19              THE COURT:  Sustained.  Rephrase your question.

20    BY MR. BLACKER:

21    Q.  Tell the Court whether or not you had a discussion with

22    Mr. Sosa at any time about handguns.

23    A.  No.  Never.

24    Q.  Had you ever shot any of the handguns?

25    A.  Well, at the beginning, when I bought them, yes, because
```

1   you have to test them and all that.

2   Q.  Tell the Court about whether or not you thought that the

3   guns were protection for the cocaine business.

4           MS. GUTHRIE:  Objection.  Leading.

5           THE COURT:  Overruled.

6           THE DEFENDANT:  No.  Of course not.  That was -- that

7   was something I used -- excuse me.  I used one of those when I

8   would go out to conduct my clothing and jewelry business.  But

9   like I said, I had a license to carry.

10  BY MR. BLACKER:

11  Q.  How did it come to pass -- withdrawn.

12      On the day of your arrest, when the police were

13  interrogating you or speaking with you, you told them that you

14  had delivered 14 kilos -- or you had delivered a box to

15  Ortega's; is that correct?

16          MS. GUTHRIE:  Objection.  Leading.

17          THE COURT:  Overruled -- sustained.  Sorry.

18          Rephrase your question.

19          MR. BLACKER:  Okay.

20  BY MR. BLACKER:

21  Q.  How did it come about that you drove a box containing the

22  14 kilos to Ortega's?

23  A.  Should I respond?  Should I respond?

24  Q.  Yes.  There's no objection.

25  A.  Okay.  The day before, Sosa had asked to borrow my car

1    because he needed to go to the auction to get a car because his

2    wife had just had a baby, and he needed a car to take his baby

3    to the doctor.  So I lent him my car, and then he brought it

4    back that night.

5        But the following day, in the morning, he called me and he

6    said:  "Joaquin, are you home?"  And he said that he needed to

7    pick up a box that he had over there.  And I said:  "Well,

8    right now, I have to go to the supermarket, which is over on

9    102nd -- rather, 112 at Ortega's.  I have to pick up some

10   merchandise there that my wife asked me to get for lunch."

11            MS. GUTHRIE:  Objection to the prior statement as

12   hearsay.

13            THE COURT:  Sustained.

14   BY MR. BLACKER:

15   Q.  How did it come about that you took a box to Ortega's?

16   A.  So then he tells me that the key was in the key chain,

17   which was in the car, and that his wife had the car.  So if I

18   could open it because he was coming over with someone else.

19   And as I was leaving ...

20   Q.  How did the box get into your car?

21   A.  So he tells me:  "Well, if you're heading there, then if

22   you could take the box."  And I picked up the box and I put it

23   in my car, and I take it there.  And the box was airtight,

24   completely closed.

25            MS. GUTHRIE:  Objection, again, to hearsay, Your

```
 1    Honor, the prior statement.

 2             THE COURT:  I'll overrule it.

 3    BY MR. BLACKER:

 4    Q.  Did you --

 5    A.  So I took the box and I went in -- well, I stood outside

 6    the supermarket and then I went in.  I went to the back of the

 7    supermarket where the meat section was, and that's where I was

 8    buying meat.

 9    Q.  Were you told what was in the box?

10    A.  No.

11    Q.  Did you assume what was in the box?

12    A.  Go figure.  It was completely sealed.  I couldn't see what

13    was inside the box, nor was I interested.  It was ...

14    Q.  Did you have any knowledge that the box contained

15    cocaine -- withdrawn.

16    A.  It may have crossed my mind, but I didn't see it because it

17    was completely shut.

18    Q.  Okay.

19    A.  So when he entered the supermarket, I give him the key.  He

20    went into the car.  He got the box.  And then he took the box

21    into the other car.  That was it.  And he gave me back the key.

22    Q.  Okay.  And when you got the key, where did you go?

23    A.  So I finished buying my groceries.  And when I was on my

24    way home, a highway patrol officer stopped me, and he says:  "I

25    want to search your car".  And I said:  "Go ahead.  Search it."
```

```
1    Q.  Okay.

2    A.  So he searched.  He found nothing.  And moreover, I was

3    pretty happy about the fact that I did not take my handgun with

4    me because I left it at home that day.

5         Then, after he searched my car, he said that:  "I want to

6    search your house."  And since I had no issue with him

7    searching my house, I told him to go ahead and search it.

8    Q.  Was there any other time that you handled any boxes or any

9    cocaine for Sosa?

10   A.  No.  No.

11   Q.  Now, during the search of your home, of the property, there

12   were approximately four kilos found in the efficiency, the PSI

13   reports.  Did you know that there were any kilos in the

14   efficiency?

15            MS. GUTHRIE:  Objection.  Leading.

16            THE COURT:  Sustained.

17   BY MR. BLACKER:

18   Q.  What did you know --

19            THE COURT:  Where is that in the PSR?

20            MR. BLACKER:  Pardon?                                .

21            THE COURT:  Where is that in the PSR?

22            MR. BLACKER:  Let me get my outline, Your Honor.

23        (Pause in proceedings.)

24            MR. BLACKER:  I'm sorry.  Can I have a moment to look

25   for it?
```

```
 1              THE COURT:  Sure.

 2          (Pause in proceedings.)

 3              MR. BLACKER:  Paragraph 24.

 4              THE COURT:  I'm sorry?

 5              Can you put the microphone to you, please.

 6              MR. BLACKER:  Sorry.  I'm sorry.  Your Honor.

 7              On the first page of my outline, it's on Paragraph 24.

 8      And it's elsewhere as well.

 9          (Pause in proceedings.)

10              MS. GUTHRIE:  Your Honor, if I may.  In the PSI, at

11      Docket Entry 36 in the 2000 case, Paragraph 26 says:  "A net

12      weight of 3.613 kilograms of cocaine was confiscated from

13      Mr. Rivero's residence."

14              THE COURT:  Well, I'm looking at Paragraph 17 of the

15      Second Revised Advisory Presentence Investigation Report, which

16      is dated January 4th, 2022, which says that:  "During the

17      search of Rivero's residence, two kilograms of cocaine were

18      found in a shed in the rear of the residence.  A further search

19      of the shed revealed an additional kilogram of cocaine in a

20      cabinet across from the cabinet where the two kilograms were

21      located."

22              So where in the Second Advisory Presentence

23      Investigation Report does it say anything about cocaine found

24      in the efficiency?

25              MR. BLACKER:  It doesn't, Your Honor.  That's the
```

```
1    point.  The shed contained -- he just testified --
2              THE COURT:  Oh.  Well, you stated that the PSR said it
3    was found in the efficiency.
4              MR. BLACKER:  Oh.  I'm so sorry.  I misspoke.
5              THE COURT:  So the cocaine was not found in the
6    efficiency.  You're not asserting that.
7              MR. BLACKER:  It was.  Everything that was illegal was
8    found in the efficiency, but it was a misnomer.  It was named
9    "the shed."  The shed is what housed the washing machine, the
10   bicycle, the dryer, things for the family that were outdoors.
11   There were no doors on that.  There's no reason to have any
12   drugs in that place.  Sosa would not put any drugs in an open
13   place with no doors.  So it was just a misnomer.
14             And I've -- my pleadings are replete with many
15   references to that, that it was wrongfully characterized as a
16   shed, but it was the efficiency.
17             THE COURT:  Okay.
18             MR. BLACKER:  I'm sorry.  I misspoke if I said
19   efficiency.
20             THE COURT:  Okay.  So I just wanted to know where it
21   said it in the PSR.
22             MR. BLACKER:  Yes.
23             THE COURT:  It doesn't.
24             MR. BLACKER:  It doesn't.  It actually says "the
25   shed."
```

```
 1            THE COURT:  Okay.  That's fine.
 2            MR. BLACKER:  I can clear that up -- he's already
 3   testified to that -- if you would like.
 4            THE COURT:  Go ahead.
 5   BY MR. BLACKER:
 6   Q.  Okay.  All right.  Was there anything illegal kept in the
 7   shed, as far as you know?
 8            MS. GUTHRIE:  Objection.  Leading.
 9            THE COURT:  Sustained.  Rephrase your question.
10            MR. BLACKER:  Okay.  He's already testified as to what
11   was in the shed.  So I'll just argue it later.
12            THE COURT:  Okay.
13            MR. BLACKER:  He said exactly what I told you.
14   BY MR. BLACKER:
15   Q.  So we've already spoken to the fact that the efficiency --
16   withdrawn.
17       You and I have gone over your PSI; is that correct?
18   A.  Uh-huh.  Yes.
19   Q.  We've also gone over some of the other pleadings in the
20   case, like the Factual Proffer and the complaint in the case;
21   is that correct?
22            MS. GUTHRIE:  Objection.  Leading.
23            THE COURT:  I'm not sure what you mean by "complaint."
24            MR. BLACKER:  The criminal complaint that was filed in
25   the case.
```

1         THE COURT:  Okay.  Okay.  Overruled.  That's fine.

2    BY MR. BLACKER:

3    Q.  Is that correct?

4    A.  Yes, Your Honor.

5    Q.  And in all of the pleadings, there's a reference to drugs

6    being in a shed.  Tell the Court whether or not --

7    A.  Yes.

8    Q.  -- you know that the shed did -- contained any drugs.

9    A.  No.  There were no drugs, not at all.  What there was in

10   the shed was a washer and a dryer and a freezer.  There was a

11   box that contained Christmas ornaments and things -- home --

12   the house things.

13   Q.  Was the shed locked?

14   A.  No.

15   Q.  Did it have doors on it?

16   A.  It was open.  It had a door, but it was one of those

17   sliding doors.  But it was always open because it was ...

18   Q.  Okay.  Now, when the officers were asking you questions,

19   tell the Court whether or not you told them that the mixing

20   compounds, the packaging, all of the items connected with the

21   drugs were yours -- were yours.

22         MS. GUTHRIE:  Objection.  Leading and compound.

23         THE COURT:  Sustained.  Rephrase your question.

24   BY MR. BLACKER:

25   Q.  Tell the Court what you told them about all the items that

1    were related to the drugs that were found.

2    A.  That that was Sosa's, that was not mine.

3    Q.  Did you tell them -- what about the packaging materials and

4    paraphernalia?  What did you tell them about that?

5           MS. GUTHRIE:  Objection.  Hearsay.

6           THE COURT:  Sustained.  Rephrase your question.

7           MR. BLACKER:  Judge, it's him speaking.

8           THE COURT:  Yeah.  I said:  "Rephrase your question."

9    It's a leading question.

10   BY MR. BLACKER:

11   Q.  Tell the Court what you told the law enforcement officers

12   about the packaging and paraphernalia materials that were in

13   the efficiency.

14   A.  That all of that was Sosa's.

15   Q.  Did you buy any of those materials?

16   A.  No.

17   Q.  Did you tell the officers -- what did you tell the officers

18   about being in possession of cocaine for the four to five days?

19          MS. GUTHRIE:  Objection.  Leading.

20          THE COURT:  Sustained.  Rephrase your question.

21   BY MR. BLACKER:

22   Q.  What did you tell the officers about --

23          MR. BLACKER:  Judge, it calls for discourse.

24   BY MR. BLACKER:

25   Q.  What did you tell the officers about the length of time the

1    cocaine had been in your house, if anything?

2    A.  Okay.  It's just that if you could just imagine when I was

3    taken back there and I was asked this question:  "Is all of

4    this yours?  Is all of this here yours."  And if they had

5    actually said to me:  "There are three or four kilos of cocaine

6    here.  Is this yours," I would have said no immediately.  But

7    when they asked if this here is yours, I said it was all mine

8    because I thought they meant the property.

9    Q.  Do you know what a cocaine press is?

10   A.  I don't.

11   Q.  Did you ever use a scale to process cocaine?

12   A.  No.

13   Q.  When the officers asked you about whether you were involved

14   in the distribution of cocaine, what did you tell them?

15   A.  I've never had anything to do with cocaine distribution.

16   Q.  Did you tell the officers that you were being paid for

17   allowing Sosa to be there?

18          MS. GUTHRIE:  Objection.  Leading.

19          THE COURT:  Rephrase your question.  Sustained.

20   BY MR. BLACKER:

21   Q.  What did you tell the officers about any payments to you

22   for allowing Sosa to be on the property?

23   A.  On one occasion, when I went to collect from him, instead

24   of giving me $300, he gave me $600.  And on another occasion,

25   when I went to collect from him, and he was already two months

```
1     behind, he gave me $900.   That was all the money that I

2     collected from him.

3     Q.   Did you tell that to the officers?

4     A.   I told them, but go figure.

5     Q.   You know in the PSI there was an acceptance of

6     responsibility statement.   Are you aware of the acceptance of

7     responsibility statement in the PSI?

8              MS. GUTHRIE:  Objection.  Leading.

9              THE COURT:  Overruled.

10    BY MR. BLACKER:

11    Q.   Let me show you -- I might have to --

12             MR. BLACKER:  May I confer with counsel for a moment?

13             THE COURT:  Sure.

14             MR. BLACKER:  Thank you.

15        (Pause in proceedings.)

16    BY MR. BLACKER:

17    Q.   Let me show you --

18             MR. BLACKER:  May I have one more second?

19        (Pause in proceedings.)

20    BY MR. BLACKER:

21    Q.   Do you remember you and I discussing your acceptance of

22    responsibility letter to the Probation officer?

23    A.   Yes.

24             MR. BLACKER:  Your Honor, I need a moment.

25             THE COURT:  Sure.
```

```
 1   BY MR. BLACKER:

 2   Q.  And this one's in English.  I know you can't read it, but I

 3   had it translated to you.  Remember?

 4   A.  Yes.

 5   Q.  Okay.  And in the statement that you gave, you tell the

 6   Court that you're going to go to -- you know you're going to

 7   have to go to prison and serve -- withdrawn.

 8       Who prepared this acceptance of responsibility statement?

 9   A.  (No verbal response.)

10   Q.  Did you write it or did the attorney write it?

11   A.  No.  My attorney must have drafted that.  I didn't.

12           MR. BLACKER:  Okay.  I'm looking for my Spanish

13   version, Your Honor.  But I've got so many papers here, I can't

14   find it.

15   BY MR. BLACKER:

16   Q.  Let me back up one minute.  Were there ever 3.67 kilos of

17   cocaine stored in your residence?

18           MS. GUTHRIE:  Objection.  Leading.

19           THE COURT:  Sustained.  Rephrase your question.

20           MR. BLACKER:  Judge, I don't understand how that's

21   leading.  It's a yes or no answer.

22           THE COURT:  Right.  That's why it's leading.

23           MR. BLACKER:  Okay.

24   BY MR. BLACKER:

25   Q.  Tell the Court whether or not there were ever 3.67 kilos of
```

```
 1    cocaine stored in your residence.

 2              MS. GUTHRIE:  Objection.  Leading.

 3              THE COURT:  Overruled.

 4              THE DEFENDANT:  At no time.  Never.

 5    BY MR. BLACKER:

 6    Q.  Tell the Court whether or not you ever told anyone that

 7    the -- it references four kilos in the PSI -- were found in

 8    your residence.

 9              THE INTERPRETER:  The interpreter needs a repetition

10    of the question.

11              THE COURT:  Yes.  Could you state the question again,

12    please, Mr. Blacker.

13              MR. BLACKER:  Yes.

14    BY MR. BLACKER:

15    Q.  Did you ever tell anyone -- I'm sorry.  Tell the Court

16    whether or not you've ever told anyone that the four kilos of

17    cocaine were found in your residence.

18              MS. GUTHRIE:  Objection.  Coaching the witness.

19              THE COURT:  Overruled.

20              THE DEFENDANT:  No.

21    BY MR. BLACKER:

22    Q.  If your attorney wrote that, did he get that fact from you?

23    A.  Let me tell you that my prior attorney and I -- what I have

24    here today with Mr. Blacker was never -- something that I never

25    had with him.  I would always go to his office, and they would
```

1    say some things to me, but overall, it was:  "You have to plead

2    guilty.  You don't want to upset the prosecution.  You'll be

3    better off."

4    Q.  We'll speak to that in a moment.  Let's finish this area,

5    please.

6        Were the four kilos that were found found in your

7    residence?

8            THE COURT:  This has been asked and answered,

9    Mr. Blacker.

10           THE DEFENDANT:  No.  Nothing was found at my house.

11   It was all in the efficiency.

12   BY MR. BLACKER:

13   Q.  Now, did your attorney read to you the acceptance of

14   responsibility statement that I just showed you -- translated

15   to you?  I'm sorry.

16           THE COURT:  Do you have an objection to the acceptance

17   of responsibility statement?  Are you trying to strike that

18   from the PSR?

19           MR. BLACKER:  I'm not trying to strike it from the

20   PSR.

21           THE COURT:  Is it in your objections?

22           MR. BLACKER:  It is.  It's part of -- I've -- it's

23   part of a more general area, but I did refer to it on numerous

24   occasions in the pleadings.

25           THE COURT:  And where is that in your pleading,

1   please?

2       (Pause in proceedings.)

3           MR. BLACKER:  (No verbal response.)

4           THE COURT:  Okay.  The objection is on Page 10 of 91,

5   Paragraph 11.  And it looks like it's a legal objection that he

6   should have been given at least a two-level reduction under

7   3E1.1, notwithstanding the fact that he absconded from

8   sentencing.

9           So I'm a bit confused as to what your objection is to

10  the acceptance of responsibility.  It looks like you want him

11  to get the two levels off, but now you're saying that what he

12  said in the acceptance of responsibility is not correct.  So

13  how would he get the two levels off?

14          MR. BLACKER:  May I explain?

15          THE COURT:  Yeah.  You need to be by a microphone.

16          MR. BLACKER:  Yeah.  Thank you.

17          My argument is -- may I sit, Your Honor?

18          THE COURT:  Yes.  Of course.

19          MR. BLACKER:  Sure.

20          My argument is, is that some of the facts that are

21  contained in the proffer and the acceptance of responsibility

22  statement, that were attributed to Mr. Rivero, he did not do.

23  And that the argument is replete in many sections of my

24  pleadings that he was told that they weren't going to contest

25  anything with the Government because his attorney was making a

1    good deal for him, he was going to get three to four years'

2    incarceration.

3           And that when he pointed out -- and I mentioned it in

4    many places -- when he pointed out to the attorney the fact

5    that he had four kilos in his residence -- it says "home," I

6    believe in the -- in the acceptance of responsibility says "his

7    home" -- well, that -- to me, that's residence.  That, I object

8    to, because he didn't have it in his home.  And when he told

9    his attorney that, the attorney said:  "We're not going to make

10   waves," to be very generic about it and not go into detail.

11   "We're making a great deal for you.  Let's not make the

12   Government angry or confront them or anything."

13          And that's what he did.  He said yes to the plea

14   colloquy.  He said yes to the proffer at the plea colloquy to

15   facts that are not true at all.  But he said yes because that

16   was -- the strategy was to make a great deal for three or four

17   years.

18          And I pointed out in the acceptance, the attorney even

19   said that he knows he's going to have to do several years.

20   That's indicia that we're talking about the three to four that

21   he talked about.

22          THE COURT:  Okay.  The reason in the PSR -- or at

23   least one of the reasons is that he absconded, and that's why

24   he didn't get the two levels off for acceptance of

25   responsibility.

1        MR. BLACKER:  Right.

2        THE COURT:  It's just not clear to me what the

3   objection is.  The objection on paper is that he should have

4   gotten the two levels off.

5        MR. BLACKER:  Yes.

6        THE COURT:  But the reason -- at least part of it is

7   because he didn't appear for sentencing.

8        MR. BLACKER:  Yes.  Part of it was that he absconded,

9   and that's why -- he did not conclude criminal activity, and

10  that's why he didn't get the two levels.  And we're saying he

11  should have.  Because he came in early, admitted his guilt, and

12  then subsequently absconded.

13        THE COURT:  So you're saying his absconding should not

14  have rendered him -- it shouldn't be a basis for not getting

15  acceptance of responsibility?

16        MR. BLACKER:  Well, it can be a basis.  It's been a

17  basis in other cases.

18        THE COURT:  I would say so.

19        MR. BLACKER:  I'm sorry?

20        THE COURT:  I would say so.

21        MR. BLACKER:  Yeah.  But we're asking that,

22  notwithstanding all of that, that -- and we've set forth the

23  reasons why we absconded in the pleading -- or at least some of

24  them.  And we're just asking the Court to consider that he did

25  accept.  He cooperated with the Government from the time that

1    he was contacted.  He cooperated against them and gave them

2    Alfredo Sosa's name.  Somehow, they didn't arrest him.  But he

3    cooperated in many different ways with them.

4          And we're arguing that he's been attributed knowledge

5    and possession of various illegal substances, which he was not

6    in possession of.  Essentially, we're saying that his

7    criminality was very passive until the day of his arrest.  All

8    he did up till that time was agree to allow this man to prepare

9    the drugs.  And on the day of arrest was the one time he was

10   active in this case.  And that's essentially what we're saying

11   about his criminality.  It's twofold.

12         THE COURT:  And what's the one time he was active?

13         MR. BLACKER:  The day of his arrest when he drove the

14   box to Ortega's, that contained 14 kilos, at the behest of

15   Mr. Sosa.

16         THE COURT:  Okay.  Any further evidentiary

17   presentation?

18         MR. BLACKER:  Yes.

19   BY MR. BLACKER:

20   Q.  The acceptance of responsibility statement that you just

21   looked at attributes to you the belief that you're going to do

22   several years in prison.  Tell the Court what you believed at

23   the time you signed that statement about what your

24   incarceration was going to be.

25   A.  He told me that I may end up doing three to five years,

1   make four, maybe three.  That I would be taken to a camp, and

2   that I would possibly get out after I served two-plus years

3   because I was a US citizen.  And that, while I was there, I

4   should take any courses that they offered because that would

5   reduce my sentence.

6           MS. GUTHRIE:  Objection.  Hearsay to the prior

7   statement.

8           THE COURT:  Overruled.

9   BY MR. BLACKER:

10  Q.  Who told you that?

11  A.  The attorney.

12  Q.  Do you remember that when you changed your plea there was a

13  hearing before the Court and you were asked a lot of questions?

14  A.  Well, I was taken to an interrogation because I haven't

15  really had any idea what a PSI is or what levels or points are

16  or any -- any of these things until now that Mr. Michael has

17  explained all that to me.  But I was taken to an interrogation,

18  and there were four or five police officers.  And then, when

19  one would ask me a question, and I was about to answer, another

20  would ask me another question.

21  Q.  Okay.  Let's move along.  We can move along quickly now.

22  So let me try and do that.  Okay?

23  A.  But why --

24  Q.  At the change of plea -- at your change of plea, the Court

25  asked the Government to summarize the facts that -- and conduct

1    that you had done in this case.  Do you remember that, when the

2    prosecutor told the Judge -- read to the Judge the things that

3    you had done?

4    A.  The truth is that I don't remember.

5    Q.  Okay.  Well, let me try and refresh your recollection.

6              MR. BLACKER:  I'm going to summarize Your Honor,

7    please.

8    BY MR. BLACKER:

9    Q.  Essentially, the Court was told that you were involved in

10   purchasing some of the products that went into the production

11   of the packaging of the cocaine, that you admitted to being in

12   possession of four kilos --

13             MS. GUTHRIE:  Objection.  Improper refreshing.

14   Coaching the witness.

15             THE COURT:  Sustained.

16   BY MR. BLACKER:

17   Q.  Okay.  The Court was told that -- among other things, that

18   you said you brought -- you -- that you agreed to store cocaine

19   in your residence.  Was that true?

20             MS. GUTHRIE:  Objection.  Leading.

21             THE COURT:  Sustained.  Rephrase your question.

22   BY MR. BLACKER:

23   Q.  Do you remember at your plea hearing the Government said

24   what you did in this case?

25   A.  I really do not remember.

1    Q.  Okay.  If the Government said that you did something that

2    you didn't do, and you answered that you did do it at the

3    hearing, why would you have done that?

4            MS. GUTHRIE:  Objection.  Leading.  Compound question.

5            THE COURT:  Sustained.

6    BY MR. BLACKER:

7    Q.  Okay.  Did -- at the plea hearing, did there come a time

8    when you -- the Court was told that you did things that were --

9    that you hadn't done?

10           MS. GUTHRIE:  Objection.  Leading.  Also --

11           THE COURT:  He says he doesn't remember.

12           Sustained.

13   BY MR. BLACKER:

14   Q.  In these instances -- now, do you remember telling the

15   Court that what the Government told her you had done was true

16   and correct?

17           MS. GUTHRIE:  Objection.  Leading.  Relevance.

18   Compound.

19           THE COURT:  Sustained as to leading.

20   BY MR. BLACKER:

21   Q.  Do you remember what you told the Court about what the

22   Government told her you had done?

23           MS. GUTHRIE:  Objection.  Leading.

24           THE COURT:  Overruled.

25           You can answer, sir.

```
 1              THE DEFENDANT:  Well, I was always told to say that I
 2      was guilty.  I was always told that I shouldn't be fighting the
 3      case, that I shouldn't anger the prosecutor, that I would be
 4      better off if I just did that.  And I really trusted him a lot
 5      and I went by what he said.
 6              Also, I had never had to go to trial or had any case
 7      of this sort.  So I had a real lack of knowledge and I just did
 8      what he said.
 9              MS. GUTHRIE:  Objection.  Hearsay.
10              THE COURT:  Overruled.
11          (Pause in proceedings.)
12              MR. BLACKER:  I'm sorry.  Did you rule?
13              THE COURT:  I did.
14              MR. BLACKER:  Oh.  I'm so sorry.
15              THE COURT:  I said:  "Overruled."
16              MR. BLACKER:  I'm sorry.
17              THE COURT:  Can you read back the question, please --
18      he answered the question.
19      BY MR. BLACKER:
20      Q.  Okay.  Approximately how long did you know Mr. Jimenez
21      before your arrest?
22      A.  What was that?
23      Q.  Before your arrest, how long did you know Mr. Jimenez?
24              MS. GUTHRIE:  Objection.  Relevance.
25              THE COURT:  Sustained.
```

1            MR. BLACKER:  Your Honor, may I proffer to the Court?

2            I want to show the full trust in Mr. Jimenez, that he

3    had other relations with him other than as a client.  I think

4    that's relevant.

5            THE COURT:  So what's the proffer?

6            MR. BLACKER:  The proffer is, is that he knew

7    Mr. Jimenez by referring him civil cases for some years before

8    he was arrested, and that they developed a relationship,

9    including socializing together, and that Mr. -- it built up a

10   trust in the Defendant where he didn't question Mr. Jimenez

11   because Mr. Jimenez was successful in these cases and was a

12   good friend to him.

13           THE COURT:  Okay.  I'll accept the proffer.

14           MR. BLACKER:  I'm sorry?

15           THE COURT:  I'll accept the proffer as true.

16           MR. BLACKER:  Okay.  Thank you.

17   BY MR. BLACKER:

18   Q.  So you mentioned that you had a strategy that you were

19   going to plead guilty.  When did you learn that it was in your

20   best interest to plead guilty, how early on in your case?

21   A.  Well, almost -- practically after the first time that I

22   spoke to him.  It was some days after I bonded out.  And from

23   there, he started to say that it was best to do the least

24   possible, that I shouldn't be making waves or rocking the boat,

25   and that I shouldn't anger the prosecutor.  And it was always

1   the same.

2   Q.  Did he come to see you before your bond hearing?

3        MS. GUTHRIE:  Objection.  Leading.

4        THE COURT:  Overruled.

5        You can answer, sir.

6        THE DEFENDANT:  Well, it's just that the matter of my

7   bond was -- for example, let's say I'm taken to jail today and

8   then the following day I bonded out.  It was very quick and I

9   really don't remember.  But we did meet several times after

10  that.  But may I clarify something about my relationship with

11  that attorney?

12       MR. BLACKER:  Will he be permitted to do that?

13       THE COURT:  Sure.

14       MR. BLACKER:  Thank you.

15       THE DEFENDANT:  Okay.  So our friendship grew between

16  us because there was this one time when I went to defend an

17  attorney from an accusation that had been leveled by my Uncle

18  Celestino.  My Uncle Celestino was a man who was not well

19  physically.  He couldn't read or write.

20       MS. GUTHRIE:  Your Honor, objection as to relevance.

21       THE COURT:  Sustained.

22       MR. BLACKER:  Okay.

23       THE COURT:  Okay.  We're going to take a break.  I

24  only have till 2:00 for you.  And we're going to break for half

25  an hour.  So we'll probably have to reset this matter.

1          But we'll break -- you want to come back at 1:30 or do

2     you want to reset it?  We're obviously not going to finish

3     today.

4          MS. GUTHRIE:  Your Honor, may I briefly be heard --

5          THE COURT:  Yeah.

6          MS. GUTHRIE:  -- regarding the testimony regarding

7     Mr. Jimenez?

8          I would proffer that all of the testimony regarding

9     Mr. Jimenez is irrelevant, based on what -- the testimony

10    that's been offered.  Also, the Defendant isn't seeking to

11    withdraw his plea, but is seeking to simply undermine the

12    credibility of his plea and his work with Mr. Jimenez.  But I

13    don't see the relevance of it for the PSI and the objection.

14         MR. BLACKER:  Your Honor, we're not trying to withdraw

15    the plea.  We haven't filed any pleading in that regard.  And

16    more importantly, this goes to his state of mind of what he was

17    thinking when he didn't object, for example, and he agreed when

18    the Court asked the Government to proffer and the proffer

19    contained tons of factual inaccuracies.  He was -- this shows

20    his state of mind, that he was saying yes, but it wasn't true.

21         And although he was under oath, he was listening to

22    his attorney.  And you know, I think the Court can acknowledge

23    this happens in the -- infrequently, but it does happen,

24    where --

25         THE COURT:  Well, what is it that you are seeking the

1   Court to do, if you're not asking -- and you're saying you're

2   not withdrawing the plea?  What exactly is it that you want me

3   to do?

4          MR. BLACKER:  We're trying to rebut the presumption of

5   accuracy at the -- at the Factual Proffer level, at the plea

6   level, to show that he acted the way he did because that was

7   the strategy of the case.  And he was continually told that

8   when he -- and I was getting to that.  When the attorney would

9   read him a pleading that was going to be filed, and it would

10  say things that weren't true, and he would tell the attorney

11  that, the attorney told him:  "Look, we have a great deal

12  going."  And it wasn't until the day before sentencing that the

13  attorney told him that it didn't go so well and that he was

14  facing a lot of time.

15          So it's relevant to what has occurred --

16          THE COURT:  What is it that you want me to do?

17          MR. BLACKER:  I want you to give him a minor role.  I

18  would like --

19          THE COURT:  But his testimony is that he was not

20  involved and at most he took a sealed box to Ortega's Super

21  Market.  Am I incorrect on that?  That's what his testimony is

22  so far, that Rosado [sic] was doing the cocaine, packaging it

23  from the efficiency, that it was not him, that he had nothing

24  to do with drug trafficking, that the scale was for jewelry,

25  and that it was the one time that Rosado asked him to take the

1    box to Ortega's Market.  That's the gist of his testimony,

2    isn't it?

3         MR. BLACKER:  It is, except he's admitted that he was

4    told that there was -- that Sosa was preparing cocaine at the

5    efficiency.  He agreed to allow him to do that.  And Sosa told

6    him he was going to give him $300 per kilo.  That's what he

7    told him.

8         THE COURT:  That's not his testimony.

9         MR. BLACKER:  He said that before.  I mean, we'll get

10   it out of him at some point, but that's exactly what I've -- my

11   knowledge of the case is that.

12        And yes, there's two episodes that he's involved in

13   this case.  One is passive.  One is active.  The passive is

14   that he allowed Sosa to do what he was doing in the apartment.

15   And the active portion is taking the box to Ortega's.  Other

16   than that, he had nothing do with this case.  I mean -- other

17   than that -- of course it's an involvement.  It's a conspiracy,

18   and he's agreed to allow this man to do that.  And he said that

19   earlier on in the hearing.  He said that Sosa told him what he

20   was doing and he allowed him to do it.  He was going to get

21   $300.

22        (Pause in proceedings.)

23        THE COURT:  So what you're asking of the Court is for

24   the Court to negate the entire Rule 11 hearing, the colloquy as

25   it pertains to the facts and the Defendant's answers when

1    questioned by the Court.  Because this rendition of facts is

2    not contained anywhere in the Rule 11 colloquy proffer of

3    facts.  This is a completely different set of facts.  Rosado is

4    not even mentioned in the proffer of facts.

5         MR. BLACKER:  No.  I think not.  I think you're right.

6    I think you're correct.

7         (Pause in proceedings.)

8         THE COURT:  Do you have any authority for -- to

9    support your position for a completely different set of facts

10   that has not been -- has not been presented to the Court in a

11   Rule 11 colloquy?  There's nothing similar whatsoever in the

12   facts that were presented to me at the Rule 11 colloquy, which

13   this Defendant agreed to, and the facts as you are now

14   presenting them.  There's nothing similar.

15        MR. BLACKER:  Well, Your Honor --

16        THE COURT:  It's completely different.

17        MR. BLACKER:  They are different, the details.  The

18   overall --

19        THE COURT:  No, not details.  Completely different.

20        MR. BLACKER:  Well, the complaint and all of the

21   pleadings --

22        THE COURT:  I'm not talking about the complaint.  I'm

23   talking about the Rule 11 colloquy before the Court.  These

24   facts that you're now asking me to rule on -- and I haven't

25   made a decision.  I've only heard the direct testimony.  I

1    haven't heard the cross or redirect -- but they are totally

2    different from the facts that were presented to the Court.

3    There's nothing similar about them.  Nothing.

4            If you can find a similarity in the transcript, please

5    tell me, because there's nothing close.

6            MR. BLACKER:  They are inapposite, Your Honor.

7    But just quickly --

8            THE COURT:  I think you need to present some authority

9    to me that this is something the Court can consider.

10           MR. BLACKER:  Well, I would ask that -- let's reset

11   this.  I'll get you -- I'll brief it for you.  And it is

12   something you can consider, but -- because it's a rebuttal of

13   the presumption.  But I want to get you some case law because

14   you're right.  This is something that I have never dealt with

15   either.

16           It is a -- it's a variance from what I have been used

17   to in these pleas.  I was not the attorney at the time, as you

18   know.  So -- but I agree with you.  So I do want to look

19   further into it and get you some authority.

20           But I'm not asking you to -- I mean, I am asking you

21   to at least see whether what we say is cogent enough to rebut

22   the presumption of correctness, because I have spent more than

23   150 occasions getting written and oral questions to the

24   Defendant that he's answered, and this is what -- the best I

25   could do to come up with over the last two and a half years.

```
 1    And he's been very consistent about what I've put in my

 2    pleadings and about the strategy that was used.  And we know

 3    it's a difficult situation, but -- but --

 4            THE COURT:  Okay.  So let's do this:  Let's take a

 5    break until 1:40.  There are some cases that I want to review.

 6    I want to hear from the Government as to their position.  And

 7    then we'll probably -- we'll either continue a little bit

 8    longer or we'll break for another setting.

 9            MR. BLACKER:  Judge, may I ask that we break until

10    another session?

11            THE COURT:  Not yet.

12            Okay.  We're going to come back at 1:40.

13            Thank you.

14            MR. BLACKER:  All right.

15            COURTROOM DEPUTY:  All rise.

16        (Recess from 1:11 p.m. to 1:53 p.m.)

17            COURTROOM DEPUTY:  This court is now back in session.

18            THE COURT:  Okay.  We're back on United States of

19    America v. Joaquin Rivero, Case Numbers 98-00023 and 00-cr-220.

20            Counsel and Probation, state your appearances once

21    more for the record, please.

22            MS. GUTHRIE:  Katherine Guthrie on behalf of the

23    United States.

24            THE COURT:  Good afternoon.

25            MR. BLACKER:  Good afternoon, Your Honor.  Michael
```

1    Blacker on behalf of Mr. Rivero.

2              THE COURT:  And Mr. Rivero is present and using the

3    aid of a Spanish language interpreter.

4              And Probation, state your appearance as well.

5              PROBATION OFFICER:  Good afternoon, Your Honor.

6    Vanessa Pulido on behalf of Probation.

7              THE COURT:  Good afternoon.

8              Okay.  So we're not going to go too much longer --

9    okay.  We're not going to go too much longer.  We only have one

10   interpreter.  So I just want to set forth what I expect now

11   from the parties.

12             Mr. Blacker, you indicated that you're going to submit

13   a memorandum detailing to the Court what you want me to do and

14   the authority that supports that proposition.  So when are you

15   going to file that, sir?  How long do you need?

16             MR. BLACKER:  I have a big, huge trial coming up.  But

17   two weeks I easily can get it done, I think.

18             THE COURT:  Okay.  And the Government -- so give me a

19   date two weeks from now, Octavia, please.

20             COURTROOM DEPUTY:  Yes, Judge.

21             THE COURT:  And then how long will the Government need

22   after that to respond?

23             MS. GUTHRIE:  Your Honor, I think it depends on the

24   memo.  But if we could have 14 days, that would be appreciated.

25             THE COURT:  Sure.

```
1              MS. GUTHRIE:  Thank you.

2              THE COURT:  When is your case starting and when does

3    it end, Mr. Blacker?

4              MR. BLACKER:  It's starting on December 5th.

5              THE COURT:  Oh.

6              MR. BLACKER:  It's a big one, though.  So ...

7              THE COURT:  Here in federal court?

8              MR. BLACKER:  No.  It's in state court, actually.

9    It's a multimillion-dollar civil suit.

10             THE COURT:  Oh, okay.  And how long is it going to

11   last?

12             MR. BLACKER:  Three days.

13             THE COURT:  Oh.

14             MR. BLACKER:  It's a big case, but there's not a lot

15   of witnesses.  It's son and a mother, you know, in argument.

16             THE COURT:  Oh, I've had some of those.

17             MR. BLACKER:  Oh, it's lovely.

18             THE COURT:  Okay.  So two weeks from now is when?

19             COURTROOM DEPUTY:  10/21, Judge.

20             THE COURT:  October 21st for your memo on what you

21   want the Court to do and authority supporting it.

22             And then 14 days after that is?

23             COURTROOM DEPUTY:  (No verbal response.)

24             THE COURT:  I once had a jury in a civil case, in

25   their verdict, write -- it was a case between a father and a
```

daughter, and in their verdict they wrote: "You should settle your familial problems outside of court."

Yes. What's the two weeks after that?

COURTROOM DEPUTY: November 4th, Judge.

THE COURT: November 4th.

And do you want a reply time, Mr. Blacker?

MR. BLACKER: Please.

THE COURT: So that would be, I think, seven days after that.

COURTROOM DEPUTY: November 11th. It's going to be a holiday.

THE COURT: It will be the 12th, since the 11th's a holiday.

COURTROOM DEPUTY: It will be the 14th because the 12th is on a Saturday.

THE COURT: The 14th. November 14th for a reply.

MR. BLACKER: Thank you.

THE COURT: And once I receive the pleadings -- I'll probably set it once I receive the original memo and the response, but obviously I'm not going to set it until they get the reply. But I can set a date so I understand the initial argument and the response, and then -- so I'll set a date. It will probably be -- when is your case starting?

MR. BLACKER: December 5.

THE COURT: Okay.

```
 1              MR. BLACKER:  I believe.  Four or five.

 2              THE COURT:  I think it will probably be after your

 3     case.

 4              MR. BLACKER:  Okay.  Because we -- we're going into

 5     maybe before Thanksgiving, but more than likely after your

 6     case.  So it will be -- your case is three days.  It will

 7     probably be mid-December before we start with the holidays

 8     there.

 9              Okay.  But once I start to receive the pleadings, I'll

10     set a date.  We'll check with counsel from both sides.

11              Thank you.  We're in recess on this matter.

12              Thank you.  Recess for the day.

13              MS. GUTHRIE:  Thank you, Your Honor.

14              COURTROOM DEPUTY:  All rise.

15          (Proceedings concluded at 1:58 p.m.)

16

17

18

19

20

21

22

23

24

25
```

1    UNITED STATES OF AMERICA      )

2    ss:

3    SOUTHERN DISTRICT OF FLORIDA  )

4                    C E R T I F I C A T E

5            I, Yvette Hernandez, Certified Shorthand Reporter in

6    and for the United States District Court for the Southern

7    District of Florida, do hereby certify that I was present at,

8    and reported in machine shorthand, the proceedings had the 7th

9    day of October, 2022, in the above-mentioned court; and that

10   the foregoing transcript is a true, correct, and complete

11   transcript of my stenographic notes.

12           I further certify that this transcript contains pages

13   1 - 65.

14           IN WITNESS WHEREOF, I have hereunto set my hand at

15   Miami, Florida, this 3rd day of November, 2022.

16

17                        /s/Yvette Hernandez
                          Yvette Hernandez, CSR, RPR, CLR, CRR, RMR
18                        400 North Miami Avenue, 10-2
                          Miami, Florida 33128
19                        (305) 523-5698
                          yvette_hernandez@flsd.uscourts.gov
20

21

22

23

24

25